NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**FUTURE FOREST, LLC,**
*Appellant*

**v.**

**SECRETARY OF AGRICULTURE,**
*Appellee*

---

2020-2039

---

Appeal from the Civilian Board of Contract Appeals in No. 5863, Administrative Judge Jonathan D. Zischkau, Administrative Judge Joseph A. Vergilio, Administrative Judge Patricia J. Sheridan.

---

Decided:  April 15, 2021

---

JACOB WILLIAM SCOTT, Smith, Currie & Hancock LLP, Washington, DC, for appellant.  Also represented by ALEXANDER GORELIK; ALAN IRVING SALTMAN, Chevy Chase, MD.

WILLIAM JAMES GRIMALDI, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC for appellee.  Also represented by JEFFREY B. CLARK, MARTIN F. HOCKEY, JR., ROBERT EDWARD KIRSCHMAN, JR.;

ANDREW E. MOORE, Office of the General Counsel, United States Department of Agriculture, Lakewood, CO; LORI POLIN JONES, Washington, DC.

_____

Before MOORE, O'MALLEY, and REYNA, *Circuit Judges.*

REYNA, *Circuit Judge.*

Future Forest, LLC appeals the decision of the Civilian Board of Contract Appeals granting summary judgment in favor of the U.S. Department of Agriculture. Future Forest and the Forest Service entered an indefinite-delivery, indefinite-quantity contract for thinning of the Apache-Sitgreaves National Forests in Arizona. The Board held that Future Forest's claim for acreage amounts beyond the contractual minimum provided for in the contract based on the implied duty of good faith and fair dealing fails as a matter of law. For the reasons explained below, we affirm.

## BACKGROUND

In 2002, forest fires burned approximately 469,000 acres of Arizona's Apache-Sitgreaves National Forests and White Mountain Apache Indian Reservation. J.A. 425. In the wake of those fires, the Forest Service sought to treat the forest and reduce the risk of further fires by removing fuels, including small-diameter trees and biomass, from the forest. *Id.*

On March 4, 2004, the Forest Service issued a Request for Proposals ("RFP") for the White Mountain Stewardship Project. *Id.* According to the RFP, the stewardship would be a long-term (ten-year) contract for the treatment of the forest and would allow the cost of treatments to be offset by the value of the forest products—for example, timber—authorized for removal. *Id.* The RFP explained that "[r]elease of the acres to be treated will be done annually over the life of the contract ([ten]-years)." J.A. 339. It further explained that the Forest Service "anticipates

releasing approximately 15,000 acres at regular annual intervals through use of task orders," but that it "may release up to 25,000 acres maximum at the regular annual interval" in order "[t]o reach the end result of 150,000 acres by the end of the contract." *Id.* The RFP disclosed that the Forest Service "will guarantee a minimum, for each program year of work, of 5,000 (five thousand) acres for a total of 50,000 acres over the [ten-]year term of the contract." J.A. 359.

On August 10, 2004, the Forest Service awarded the White Mountain Stewardship Project Contract ("WMSC") to Future Forest. J.A. 416. The contract repeated the RFP's language stating that the Forest Service "anticipates" releasing approximately 15,000 acres per year "[t]o reach the end result of 150,000 acres by the end of the contract." J.A. 426. The contract further specified that it "is an indefinite-quantity contract for the supplies or services specified," and that the Forest Service "shall order at least the quantity of supplies or services designated in the Schedule as the 'minimum.'" J.A. 480. The Schedule, in turn—like the RFP—stated that the Forest Service "will guarantee a minimum, for each program year of work, of 5,000 (five thousand) acres for a total of 50,000 acres over the [ten-]year term of the contract." J.A. 3. Between September 2004 and May 2014, the Forest Service issued task orders releasing 71,737.90 acres for landscape biomass management. J.A. 4. The contract expired in August 2014. *Id.*

On June 13, 2017, Future Forest submitted a certified claim to the contracting officer for $14,743,430.72 in "lost gross profit," alleging that the Forest Service breached its duty of good faith and fair dealing by failing to issue task orders for treatment of 150,000 acres over the ten-year period of the WMSC. J.A. 710. On September 22, 2017, the contracting officer issued a final decision denying Future Forest's claim in its entirety. *See* J.A. 717–18. The contracting officer explained that the government satisfied its

obligations under the WMSC by ordering Future Forest's services with respect to 71,737.90 acres, an amount that exceeded the guaranteed contractual minimum of 50,000 acres. *See* J.A. 713. By exceeding the guaranteed minimum, the contracting officer determined, the government met and surpassed any reasonable expectations that could have been derived from the contract. *Id.* The contracting officer rejected Future Forest's argument that government officials led it to reasonably expect treatment of 150,000 acres, and that the Forest Service was therefore contractually bound to meet Future Forest's expectations. J.A. 714–16. The contracting officer observed that the government officials' cited statements did not guarantee 150,000 acres, and some were made years after the contract was awarded, negating any reliance by Future Forest on them when entering the contract. J.A. 715–16.

On October 26, 2017, Future Forest filed a complaint with the Civilian Board of Contract Appeals ("Board"), again seeking $14,743,430.72 based on the Forest Service's alleged breach of its implied duty of good faith and fair dealing. *See* J.A. 749–61. Future Forest first alleged that the Forest Service created a reasonable expectation that it would order treatment of 150,000 acres of forest, not the contractual minimum of 50,000 acres. *See, e.g.*, J.A. 751–53. Future Forest alleged that Forest Service personnel had represented that the Forest Service intended to order treatment of 150,000 acres even though the contract only required treatment of 50,000. *See, e.g.*, J.A. 751. Future Forest also pointed to high-ranking Forest Service officials' testimony before Congress in 2008 and 2009, in which the officials described the WMSC as a ten-year contract for the treatment of 15,000 acres per year for a total of about 150,000 acres. *See* J.A. 751–52.

Future Forest also alleged that the Forest Service improperly interfered with the issuance of task orders, resulting in the Forest Service placing orders for treatment of only 71,737.90 acres rather than the 150,000 acres that

Future Forest expected. *See* J.A. 753–61, 3044–45. Future Forest alleged that the Forest Service minimized orders placed under the WMSC so that it could thin forest further west under a different long-term stewardship project called Four Forest Restoration Initiative ("4FRI"). J.A. 756–61. Future Forest further alleged that the Forest Service's ordering decisions were motivated by "animus" toward Future Forest. J.A. 760.

On April 22, 2019, the Forest Service moved for summary judgment that it had not breached its implied duty of good faith and fair dealing. *See* J.A. 1182–1203. The Forest Service argued that it had discharged its obligations under the WMSC by ordering treatment of more acreage than the 50,000-acre contractual minimum, *see* J.A. 1196–1201, and that its decision to fund 4FRI did not violate its duty of good faith and fair dealing under the WMSC, *see* J.A. 1201–03.

In response, on April 27, 2019, Future Forest filed a motion for leave to take additional discovery. *See* J.A. 1234–57. It submitted declarations by individuals with alleged personal knowledge of the WMSC, including Forest Service retirees. *See* J.A. 1279–1316. These individuals declared, among other things, that the Forest Service held a belief as of May 2010 that it would order treatment of 150,000 acres and indeed that it was required to do so, *see* J.A. 1280; that the Assistant Director of Forestry in the region had a "personal animus against the WMSC" and sought to order the minimum amount of treatment required under the contract, J.A. 1288, 1302; and that the Forest Service turned down funding requests for the WMSC with "hostil[e]" statements such as, "Future Forest is already making millions," and "Future Forest is screwing us," J.A. 1301. Future Forest sought to depose certain individuals to obtain more evidence regarding the Forest Service's belief that it would order treatment of 150,000 acres and regarding the Forest Service's reasons for failing to do so. *See* J.A. 1234–57. According to Future

Forest, this evidence would be vital to Future Forest's case. J.A. 1256.

On May 21, 2019, the Board issued an order explaining that, before it would permit the additional discovery, the parties must first brief the "threshold legal question of whether the implied duty of good faith and fair dealing can expand the requirements on an indefinite delivery/indefinite quantity contract beyond the contract minimums." J.A. 3030.

On March 9, 2020, after the parties submitted their briefing, the Board concluded that Future Forest's theory fails as a matter of law "such that summary judgment is appropriate and the appeal is denied." J.A. 2. The Board reasoned that certain Forest Service employees' statements that they hoped and intended to treat 150,000 acres under the WMSC did not, as a matter of law, transform the nature of the WMSC into a definite quantity or requirements contract. *Id.* According to the Board, "The written language of the contract with the guaranteed minimum dictates the parameters of reasonable expectations." *Id.*

Future Forest appealed. We have jurisdiction under 28 U.S.C. § 1295(a)(10).

STANDARD OF REVIEW

We review the Board's decisions on questions of law de novo and set aside factual determinations that are arbitrary, capricious, or unsupported by substantial evidence. 41 U.S.C. § 7107(b)(2); *Rockies Express Pipeline LLC v. Salazar*, 730 F.3d 1330, 1335–36 (Fed. Cir. 2013); *Engage Learning, Inc. v. Salazar*, 660 F.3d 1346, 1352 (Fed. Cir. 2011).

DISCUSSION

"The duty of good faith and fair dealing is inherent in every contract." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 828 (Fed. Cir. 2010). The duty

prohibits a party to a contract from interfering with another party's rights under the contract. *Id.* But not all misbehavior breaches the implied duty of good faith and fair dealing. *Id.* at 829. The archetypal breach involves "the old bait-and-switch," or in other words, eliminating or rescinding a contractual provision or benefit through a subsequent action directed at the contract. *Id.* (citing *First Nationwide Bank v. United States*, 431 F.3d 1342, 1350–51 (Fed. Cir. 2005); and then citing *Centex Corp. v. United States*, 395 F.3d 1283, 1304–07 (Fed. Cir. 2005)). For example, in *Centex* and *First Nationwide*, the government breached its duty of good faith and fair dealing when it sold failing savings and loan institutions to private companies in exchange for significant tax deductions and then, a few years later, enacted targeted legislation that retroactively disallowed those tax deductions. *First Nationwide*, 431 F.3d at 1344–45, 1349–51; *Centex*, 395 F.3d at 1304–06.

We have explained that the implied duty of good faith and fair dealing cannot expand a party's contractual duties beyond those that are expressly set forth in the contract, nor can it be used to create new duties inconsistent with the contract's provisions. *Precision Pine*, 596 F.3d at 831; *Century Expl. New Orleans, LLC v. United States*, 745 F.3d 1168, 1179 (Fed. Cir. 2014). To the contrary, "the nature of that bargain is central to keeping the duty focused on 'honoring the reasonable expectations created by the autonomous expressions of the contracting parties.'" *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 991 (Fed. Cir. 2014) (quoting *Tymshare, Inc. v. Covell*, 727 F.2d 1145, 1152 (D.C. Cir. 1984)). Put differently, the implied duty of good faith and fair dealing is "limited by the original bargain: it prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value." *Metcalf*, 742 F.3d at 991. Accordingly, a party's conduct will not be found to violate the duty "if such a finding would be at odds with the terms of the

original bargain, whether by altering the contract's discernible allocation of risks and benefits or by conflicting with a contract provision." *Id.*

Future Forest argues that, even though the Forest Service met and exceeded its obligations expressly imposed by the WMSC when it ordered treatment of 71,737.90 acres rather than the 50,000-acre contractual minimum, the Forest Service nonetheless breached its implied duty of good faith and fair dealing by deciding—undisputedly in its own discretion—not to order treatment of a total of 150,000 acres. Appellant's Br. 18, 24, 28–29. According to Future Forest, the Forest Service breached that duty when it led Future Forest to believe that it would order treatment of 150,000 acres but did not follow through, allegedly because the Forest Service fostered an unwarranted animus toward Future Forest, and because Forest Service officials had an improper personal desire to fund 4FRI instead of WMSC. *See, e.g.*, *id.* at 29.

Future Forest misapprehends the implied duty of good faith and fair dealing. Specifically, the duty cannot be used to alter the WMSC by increasing the contractual minimum guarantee of acreage. *See Precision Pine*, 596 F.3d at 831; *Century*, 745 F.3d at 1179. Notably, Future Forest does not allege that the Forest Service interfered with a bargained-for benefit to which Future Forest was expressly entitled under the contract, such that the implied duty of good faith and fair dealing could properly be invoked. Instead, Future Forest argues that representations made by Forest Service personnel created a "reasonable expectation" of 150,000 acres, and that those representations legally bind the Forest Service. The implied duty of good faith and fair dealing cannot bind the Forest Service in this regard because the duty is "limited by the original bargain." *See Metcalf*, 742 F.3d at 991.

*Travel Centre v. Barram*, 236 F.3d 1316 (Fed. Cir. 2001), is instructive. In *Travel Centre*, we addressed

the implied duty of good faith and fair dealing in the context of an indefinite-delivery, indefinite-quantity ("IDIQ") contract relating to travel management services. The solicitation provided revenue estimates under the contract of approximately $2,500,000 total per year in Maine, New Hampshire, and Vermont. *Travel Centre*, 236 F.3d at 1317. The Government Services Administration ("GSA") awarded the contract to Travel Centre with respect to Maine and New Hampshire, and the contract expressly referred to Travel Centre as a "preferred source" for travel management services in those states. *Id.* at 1318–19. However, the contract also set a guaranteed revenue minimum of $100 and specified its nature as an IDIQ contract. *Id.* at 1317. We explained that neither the solicitation's revenue estimates nor the description of Travel Centre as a "preferred source" gave rise to any reasonable expectation that GSA would order more services than the contractual minimum. *Id.* at 1319. We held that "when an IDIQ contract between a contracting party and the government clearly indicates that the contracting party is guaranteed no more than a non-nominal minimum amount of sales, purchases exceeding that minimum amount satisfy the government's legal obligation under the contract." *Id.*

Consistent with *Travel Centre*, we conclude in this case that the WMSC required the Forest Service to order a minimum of 50,000 acres, and that the Forest Service satisfied that obligation by ordering 71,737.90 acres. To hold otherwise would be to rewrite the contract to impose an obligation on the Forest Service that is not supported in the WMSC. Because the implied duty of good faith and fair dealing cannot be used in that manner, *see Precision Pine*, 596 F.3d at 831; *Century*, 745 F.3d at 1179, we affirm the Board's decision.

CONCLUSION

We have considered the parties' remaining arguments and do not find them persuasive. For the reasons explained above, the Board's decision is

**AFFIRMED**